### THE CHEROKEE.[1]

### THE MONARCH.

### YOUNG v. THE CHEROKEE and Cargo.

(*District Court, South Carolina.* June 6, 1887.)

1. SALVAGE—FORFEITURE FOR MISCONDUCT.

To cause a forfeiture of salvage, there must be evidence of misconduct on the part of the salvors. The thoughts or desires of salvors are immaterial, unless their conduct be influenced thereby.

2. SAME—BOND—EXCESSIVE DEMAND.

Though, in view of the value of the services of the salvors upon final hearing the bond originally demanded appear grossly excessive, the court will consider

[1]Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

all of the circumstances which attended its taking, and will not decree a forfeiture of salvage in consequence, unless it be made to appear that it was the intention of the salvors to thereby harass or oppress the claimants, or to enforce compliance with an exorbitant demand.

**3. SAME—FIRE—DISOBEDIENCE TO ORDERS.**
When a vessel is on fire along-side of a wharf, a salvor disobeying either the orders of the master of the vessel, or the chief of the fire department, will be guilty of misconduct.

**4. SAME—AMOUNT OF COMPENSATION.**
Though the principles upon which salvage compensation is regulated are well known, it is almost impossible for different minds to contemplate the same case without forming different conclusions with regard to compensation.

In Admiralty.

*Mitchell & Smith*, for libelant.

*Bryan & Bryan*, for respondent.

SIMONTON, J. This is a libel for salvage. The Cherokee is an iron passenger steam-ship of the Clyde Line, between Charleston and New York. She is built in six compartments, divided by iron bulkheads from the skin of the ship to the main deck. She has a one compartment forward, and another aft, for freight. The latter compartment has a lower hold just over the bilge, and a hold between decks.

On eighth February, 1887, at 9 A. M., she left her dock on her voyage to New York. When she was in the stream, about 200 yards from her dock, fire was reported in her lower after-hold. The master, thinking that he could not go back to the city afire, cast anchor, and began to use the appliances against fire on his ship, with which she was equipped under section 4470, 1 Rev. St. The Monarch, a powerful steam-tug, with a fire pump, went to her assistance. Soon afterwards the Cherokee, under her own steam, and towing the Monarch, went back to her dock, and was at once taken in the charge of the city fire department. The hold was filled with water, and the fire extinguished. The vessel is worth $200,000; the cargo, $66,500; freight, $6,000.

Is this a case of salvage? The fire was in the lower after-hold, out of sight, among cotton, cotton goods, and other combustible materials. The compartment was in an iron vessel, with iron bulk-heads, fire-proof. But the hold itself was not fire-proof. The deck above it was of wood, except for a space of a few feet around the hatchway, which was sheathed with iron. The hatchway, seven and one-half feet long by twelve feet wide, was covered by a hatch of wood, divided into six movable parts. The hold between decks, just over the lower hold, had in it, as we have seen, cotton in bales, oranges in wooden boxes, shingles and lumber. Above this hold, between decks, were the saloons, berths, and other accommodations for passengers, all of wood, and above the upper edge of the iron bulk-heads. A cotton fire is always dangerous, inscrutable, treacherous. In the hold of a ship it is the more dangerous, as its exact locality, extent, and progress, are unknown.

The master of this steam-ship, with all his appliances for controlling fire in active operation, and with the tug Monarch and her appliances along-side and in use, as soon as he found that he could return to his

dock, at once weighed anchor, and put himself under the protection of the city fire department, which had been summoned to his aid.

The services contributed by those under no legal obligation to render them, in saving property threatened with destruction on navigable waters, are salvage services. *The Oregon,* 27 Fed. Rep. 872; *McConnochie* v. *Kerr,* 9 Fed. Rep. 53. In this case the tug fulfilled all the conditions of the definition. The services were salvage services. Has she lost her right to compensation for these services by the misconduct of her master or of her owner?

It appears that some days after the fire, in a conversation with Capt. Vogel, who had been instrumental in bringing the steam-ship back to her dock, the libelant said to him: "If you had not come aboard, we would have had a picnic." Holborn, the master of the tug, in giving his testimony on the stand, admitted that in his heart he wished that the steam-ship, instead of going back to the dock, had gone upon the hard bottom on the opposite shore. There is no evidence that either of them, by word or act, endeavored to influence or persuade the master of the steam-ship not to return to the dock. Men should be judged by their actions. There can be no doubt that both of these persons would have been glad to save the ship without aid, and to earn large salvage compensation thereby, and that this thought was in their minds. But unless they gave expression to this thought by conduct, by actions seeking to carry it out, they cannot be said to be guilty of misconduct involving loss of compensation for any aid furnished.

Again, it is alleged that the master of the tug was guilty of misconduct in that he resisted and disobeyed the order of the chief of the fire department, and the master of the ship, to take his hose away. The Monarch having been sought for by Mr. Holmes, of the Clyde line, and told that the Cherokee was afire, went along-side, and passed up her hose, which were put down the trunk of the hatch. She began at once to pump. The master did not report to the master of the steam-ship or any one else. All the officers of the ship, however, saw him, his tug, and his hose, and knew what he was doing. One other tug (the Maryland) had put in her hose and tried to pump. She was dismissed summarily. The Morgan offered aid; it was refused. Nothing was said to the Monarch by way of remonstrance, protest, or order. She accompanied the ship to the dock, lashed to her. As they reached the wharf the chief of the fire department came aboard, and ordered the hose of the tug out. Holborn refused to do this unless the master of the steamship required him to do so.

In cases of fire aboard ship at the wharves of this city, collision always arises between the fire department and the masters of tugs seeking to be salvors. It is important to settle the question.

When a ship is threatened with destruction by fire, and her officers and crew are aboard of her, in charge, anyone proffering salvage services must render them under the control and direction of the master, who has the right to reject them if he chooses. *The Susan,* 1 Spr. 502; Williams & B. Adm. Jur. 148, note *q; McLachlin's* Treatise, 617; *The Chouteau,*

5 Fed. Rep. 463. The salvors cannot intrude themselves, or, having permission to come on board, cannot take charge of the ship. *The Dodge Healy*, 4 Wash. C. C. 656. When such a vessel is at a wharf, and the fire department is called out, and comes to her assistance, the chief of the department has control of all means used in repressing and extinguishing the fire. His duty is to protect all the adjacent property from fire. He is at the head of this branch of the city police. His action cannot be disturbed or set at naught by anyone. Digest of City Ordinances, § 306; *The Huntsville*, MAGRATH, J., quoted in Cohen, Adm. 75, 76. He does not supersede the master of the ship, nor can he rescind any prior contract the master may have made. He controls and directs all appliances which the department has, or which the ship may have, or may have procured, by which it is sought to subdue the fire. It makes no difference to the chief whether the fire originated at the wharf, or whether the ship, being away from it, came to it, properly or improperly, lawfully or not. The fact of the fire at the wharf, endangering adjacent property, makes it his duty to suppress it; gives him authority to direct in its suppression. *The Mary Frost*, 2 Woods, 306. If the master disputes this, his only alternative is to go away from the city. So long as the ship is at the wharf the fire department must control all the means used in putting the fire out. Disobedience on the part of the tug, of the orders of the master or the chief, would be misconduct.

There is great conflict in the testimony on these points. The best witness, however, of disobedience of his orders, is the chief himself. He says that when he ordered the hose of the Monarch out, and received the reply that the master of the steam-ship had employed the tug, he asked the master if this was so. Receiving a reply in the affirmative he did not renew his order, as he had no right to do so. In other words, he recognized that he had no right to disregard the means the ship was employing to the common end, unless they interfered with, interrupted, or counteracted his efforts.

The testimony is also conflicting upon the point of disobedience to the master of the steam-ship. He says that when the chief came aboard, and gave his order that the hose of the tug go out, he confirmed it. The master of the tug contradicts this. Others give testimony on both sides. We must rely on the undisputed facts which appear in the case. When the ship was in the stream, the tug Maryland put her hose aboard, was ordered off and dismissed. So, the tug Morgan tried to get in, and was refused. When the Cherokee and the Monarch first reached the wharf, the fire department put only one hose aboard. While the Cherokee was moving with the ship the fire engines could not get at her. The Monarch still accompanied her. When she got finally in, and all the hose of the city were in action, the chief told the master that he had the fire under control, and that the Monarch was no longer needed. The master then gave the order to take out the hose, and it was at once and without question obeyed. In other words, when the master of the Cherokee gave an order he wished obeyed, he enforced it. The impression made at the hearing of the testimony has been deepened by a careful exami-

nation of the notes of the stenographer, that the aid of the Monarch was sought, was accepted, and was used. It was dispensed with finally when the fire department was in position to use all its engines on the fire.

Another, and a more serious, charge of misconduct, is that, when libelant made his claim for compensation, he was evasive and unreasonable, and that, seeking to compel an extravagant amount, he took advantage of the absence of the court in the Western district, and the necessity the passenger ship was under of filling her schedule time, and demanded an enormous stipulation for ship and cargo.

A salvor who takes advantage of a foreign ship in a foreign port, away from her friends and home credit, pressed by necessity to leave the port, and who, under these circumstances, demands extravagant salvage compensation, and seeks to enforce his demands by requiring an exorbitant bond, may well be accused of piratical conduct. He deserves reprobation and punishment at the hands of the court. It is greatly to be regretted that we are deprived of the advantage of the testimony in open court of one of the chief actors in this matter. So far as the evidence discloses, the facts are these: An interview took place on the day of the fire between the libelant and Mr. Courtenay, of the Clyde Line, with whom was Mr. Eager, a general agent of the line, and the master of the steam-ship. This interview was in the office of Mr. Courtenay. Libelant was asked what was his charge for the services of his tug. The ship was then full of water in the lower after-hold. The cargo was not known. The loss was not and could not then be ascertained, nor could the amount of assistance rendered by the Monarch be measured. Libelant replied that he could not say, was not prepared to say, and that he would consult his tug-master, and see Mr. Courtenay the next day. This was recognized as a proper thing to do. The next day libelant again saw Mr. Courtenay. Mr. Paine heard a good deal of what transpired in this interview. He was within earshot, in an adjoining room. Mr. Courtenay tried to get libelant to state his charge. To this he gave evasive replies. No estimate was made by either side in the shape of a definite offer, except that Mr. Courtenay thought that $300 or $400 was enough. To a question from him, what libelant charged for pumping, the latter replied sometimes $10, sometimes $20, sometimes $5,000, an hour. Libelant, in his detailed account of this interview, says that Mr. Courtenay disclaimed any authority to settle, except under instructions from Mr. Clyde, and advised negotiations with him. Two facts are clear: The parties were never in a position to agree. One claimed that he had rendered salvage service, and held the liberal idea of its value salvors always hold. The other did not think the service higher than pumping. For this he was willing to pay liberally, but not according to the popular measure of salvage. The other is that no tender of any sum was made. A resort to the court was inevitable. The negotiations then began as to the amount of bond to be given for ship and cargo. The libel prepared stated no sum definitely. The court was over 240 miles away. The amount of the stipulation was a matter of consent, as the ship wanted to go. The action of the marshal was stayed until this

could be fixed. Mr. Courtenay went with libelant to the office of the attorney of the latter. The amount of $40,000 was first suggested for the bond, but was immediately withdrawn, and $20,000 was asked. This was indignantly and peremptorily rejected. It was finally given, as the ship had to go.

This bond was a large one, especially in the view now taken of the case; unnecessarily large. But we have had the advantage of a great deal of testimony. The construction of the ship, her complete appliances, the stowage of her cargo, the character of the cargo, the conduct of her officers and men, are now known as they were not known before. This result has been reached by skillful, laborious, and far-reaching effort. Our question is, was the demand for this bond, under all the circumstances, such an act of misconduct as calls for punishment by the court? No money was demanded, the payment of which was to be enforced by the demand for the bond. The real liability on the bond was payment of such sum as the court should decree. The bond was not demanded from a stranger, without friends or credit in this port, who would be compelled to seek and to pay for his sureties. The owners of this vessel "have," as has been well said by their eloquent counsel, "domiciled themselves in this port." Not only are they in the best credit; they are backed by the strongest influence, social and commercial, in this city. No sureties were asked or expected.

The bond covered cargo, as well as the ship. The cargo could be held to protect the bond. A decree of salvage could not be enforced against the ship except to the extent of its proportion. Perhaps the testimony would disclose that the ship was fire-proof, and that the cargo alone was salved. The cargo was of value unknown. It filled, however, a large ship. If it left the port with no bond, or an insufficient bond, all lien on it was gone. Others might put in claims. The chief of the fire department had used expressions which indicated some claim. The Maryland had hopes. Perhaps the Morgan would intervene. The bond took the place of the ship and cargo. Considerations like these, with the testimony of the libelant that he had declared his willingness to accept the bare assurance of Mr. Courtenay without more, with the further fact that the whole matter was supervised by able and honorable proctors of this court, satisfy me that the bond was not demanded in order to harass or oppress, or to force compliance with an exorbitant claim for salvage. And this would be necessary to make out misconduct of a character grave enough to involve forfeiture of salvage. Newson, Salv. 317; *The Charles Adolphe*, Swabey, 153; Williams & B. Adm. Jur. 147; *The Rialto*, 15 Fed. Rep. 124; *The Alaska*, 23 Fed. Rep. 615; *The Leipsic*, 5 Fed. Rep. 108; Cohen, Adm. 288, 289.

What compensation shall be awarded the tug? No question seems to perplex judges more than the amount to be awarded in salvage cases. The inquiry is not what the services are worth, but what is a generous award, which would not only encourage the salvors, but all others to do likewise. Dr. Lushington says in *The Princess Helena*, 1 Lush. 190, that the court "countenances and favors the meritorious class of persons

known as 'salvors.'" But when we examine the cases we find the widest range, from extreme generosity to parsimony, in the awards. As Chief Justice MARSHALL says in *The Sybil*, 4 Wheat. 98: "It is almost imposs-ible that different minds contemplating the same subject should not form different conclusions as to the amount of salvage to be decreed." No fixed rule existing, we look to general propositions as a guide. In *The Suliote*, 5 Fed. Rep. 99, Mr. Justice BRADLEY, with characteristic clear-ness and terseness, states the principle:

"Salvage should be regarded in the light of compensation and reward, and not in the light of prize. The latter is more like a gift of fortune, conferred without regard to the loss or sufferings of the owner, who is a public enemy. Salvage is the reward granted for saving the property of the unfortunate, and should not exceed what is necessary to insure the most prompt, energetic, and daring efforts of those who have it in their power to furnish aid and suc-cor. Anything beyond this would be foreign to the principles and purposes of salvage. Anything short of this would not secure its objects. The courts should be liberal, but not extravagant. Otherwise that which is intended to be encouragement to rescue property from destruction may be a temptation to subject it to peril."

Mr. Justice CLIFFORD in *The Blackwall*, 10 Wall. 1, lays down six points to be considered in getting at an award in these cases.

In *The Chetah*, 19 Law T. (N. S.) 621, L. R. 2 P. C. 205, they are stated thus:

"In estimating the value of salvage services, circumstances, among others to be considered, are—*First*, the degree of danger to which the vessel was ex-posed, and from which she was rescued by the salvors; *second*, the mode in which the services of the salvors were applied; *third*, the risk incurred by the salvors in rendering these services."

We will follow these, and apply the facts of this case to them.

The danger to which the ship was exposed, and from which she was rescued. The Cherokee is a steam-ship built of iron. The fire was in a water-tight compartment, into which water, the most efficient agent in extinguishing fire, could be poured and retained. She was thoroughly equipped with steam and water apparatus in full operation in the local-ity of the fire. She was fully manned, and under complete control. Her officers and crew were on the alert and efficient. Her engines were in working order, and working, protected from the fire by fire-proof bulk-head. She had on a full head of steam, 130 pounds pressure. She was in smooth water, on a calm day, in a river, a few hundred yards from her own dock, within a few minutes' call of an efficient fire department, subject to the orders of her agent, who is the mayor of this city. The fire was in her lowest hold. It was in cotton, but it was smothered, smouldering, progressing slowly. She was in danger, but not in imminent, pressing, immediate danger. Going to the wharf un-der her own steam, her hatch was permanently opened, and her hold filled. The operation was simply mechanical. In her compartment forward she had an inflammable and highly dangerous cargo. It was, however, over 100 feet from the fire, separated by the engine-room and four fire-proof iron bulk-heads. So long as the fire could be kept in

the lower after-hold, and did not blaze out, this part of the cargo was perfectly safe. When the ship got to the wharf, and the fire department took charge, she was safe beyond peradventure.

The mode in which the services of the salvors were applied. The tug was at the head of a wharf, about to dock a schooner. Mr. Holmes, in the employment of the Clyde Line, running up, informed her master that he had come for the Monarch; the Cherokee was on fire. At once, without delay or further inquiry, he left the schooner, went at full speed to the Cherokee, preparing his hose and pump on the way. Getting along-side, he put in his hose and pumped at once at the locality of the fire. It was no time to stop or to report. An agent of the line sent him word that the Cherokee was afire. The message itself involved the instructions to aid her, and at once. The tug is a powerful machine, with a pump whose capacity, under favorable conditions, is 2,500 gallons a minute, through eight hose. On this occasion she used three (3) hose, in sections 100 feet each. These hose ran over the combing of the hatch on the hurricane deck into the hold between decks over the hatch of the lower after-hold. There is much conflict of testimony upon the point whether these hose ever played directly into that hold. In the view taken of this case, this is not of decisive importance. The hose of the Monarch were put into the ship down where the ship's hose were. The master and the crew of the tug did not go down to the locality of the fire. The officers and crew of the ship were there in charge and directing. The Monarch gave them her hose and her water. If these were directed to and played on the cargo and deck of the between-deck hold, the wood of the hatch and the deck and the cargo stored there were kept wet, and, in case of an outbreak of the fire, would check it. The water thus poured on them passed through scuppers into the bilge below the lower after-hold, filled it, and came up into that hold. When the ship reached the dock a quantity of water was found in the hold. So, whether the stream from the Monarch went directly into the lower after-hold through the hatch, or indirectly through the scuppers and the bilge, it was of great service. Filling the hold was the surest method of putting out the fire, the only method finally adopted, and adopted successfully. These services the tug rendered, aiding the ship's appliances until the fire department took charge, and she accepted her dismissal.

In *The Baker*, 25 Fed. Rep. 774, Judge WALLACE says:

"Neither the value of the property imperilled, nor the exact *quantum* of service performed, is a controlling consideration in determining the compensation to be made. The peril, hardships, fatigue, anxiety, and responsibility encountered by the salvors in the particular case, the skill and energy exercised by them, the gallantry, promptitude, and zeal displayed, are all to be considered."

This brings us to the consideration of the risk incurred by the salvors. The fire was smouldering in the cargo in the lower hold. The ship was not afire. The tug was at no time in any danger. Nor did her owner, officers, or crew incur any danger going to the ship, going aboard of her, or remaining on her deck. They did not assume any direction of

the means used to put out the fire. They remained on the hurricane deck. They encountered no hardship or fatigue. They were under no responsibility. They had no opportunity of displaying any skill or gallantry. They did exhibit, in a very commendable degree, promptitude and zeal, all the more commendable as the steam-ship was full of passengers. But all that they did, all that they could do under the circumstances, was to furnish their pumping apparatus and their water, aiding the pumps and the steam appliances of the ship.

Taking all these matters into consideration, and estimating the salvage service thereon, giving the ship the benefit of her own construction and appliances, and taking into account the services of the fire department, for which no claim has been made, but which, nevertheless, inure for the advantage of the ship, (*The Baker*, 25 Fed. Rep. 773,) I award to the libelant, as the share of the services of the Monarch therein, the sum of $650. The costs, except the cost of the stenographer, for which provision has been already made, will follow the award. Let a decree be entered in conformity with this opinion.