## THE KEKOSKEE.

## CURRY et al. v. RICHFIELD OIL CO.

## GEORGIA CO. v. SAME.

### Nos. 12973, 12989.

District Court, W. D. Washington, N. D. Feb. 18, 1931.

M. W. Vandercook, of Seattle, Wash., for libelants Curry and others.

Stratton & Kane, of Seattle, Wash., for libelant Georgia Co.

Huffer, Hayden, Merritt, Summers & Bucey, of Seattle, Wash., for respondents and claimants.

NETERER, District Judge.

On February 3, 1930, while the Kekoskee, an oil tanker carrying 54,000 barrels of gasoline and oil in seven or more tanks, was at Pier 40, port of Seattle, a southeasterly wind prevailed having a velocity of about seven miles per hour. The deck of the Kekoskee was on practically an even plane with the floor of the dock. Under the dock the water was covered with oil, gasoline, and débris. This was discovered on fire. The fire was communicated to the dock structure, flames coming through the opening made for repair

work. The flames increased and flared up to 90 or 100 feet, being wafted by the wind against and over the Kekoskee. The area of the fire was approximately 270 feet along the dock and 60 feet deep.

The Kekoskee is a steel-constructed oil tanker, value approximately $500,000.00, built in 1920, length 392 feet, beam 51 feet, depth 30.2 feet, had a full crew of 34, including master and officers, was lying bow inshore, starboard side next to the dock, discharging gasoline and fuel oil from her cargo tanks to shore tanks, and, when the fire was discovered, was discharging fuel oil for bunker purposes to the United States Coast Geodetic Survey steamer Surveyor.

The tug Georgia is a wooden hull 110.2 feet in length, 22 feet beam, 9.2 feet depth, approximately 500 horsepower, built in 1902 as a passenger steamer, rebuilt thereafter as a tug, and equipped in 1927 with a special towing apparatus at a cost of approximately $27,000. The market value of the "Georgia" on the date of the fire was anywhere from $30,000 to $50,000 (replacement value $53,000 to $63,000). She had a crew of six men, including master and officers. At the time in issue the captain was up town and did not render any service.

Three other tugs were berthed in the slip at the dock along the shore between Piers 40 and 41. Two of them were not manned—out of commission. The other was under repair. The Surveyor was lying at the port side of the Kekoskee taking fuel oil. The oil on the Kekoskee for pumping was heated to 100 degrees Fahrenheit, and one inch of steel separated the oil from the fire on top and on the side.

When the alarm was given, the master of the Surveyor, looking up, saw the smoke and flame over the Kekoskee. The pump was shut off, lines released, moved full speed ahead without disconnecting the hose, which was torn from its fastenings, spilling oil on the water of the port side of the Kekoskee, and when about 300 feet astern the Kekoskee, in response to the shout from the Kekoskee for help, the Surveyor reversed, and immediately a barrel of oil exploded on the dock about 27 feet from the forward part of the Kekoskee, making a loud report, throwing oil over the forward part of the vessel, putting the whole forward part of the ship aflame, whereupon the Surveyor again moved "full speed" ahead 50 or 75 feet farther astern the Kekoskee. All vents on the oil tanks were closed.

The first fire alarm was given at 1:40, fire department time (1:45, Kekoskee time). The fire chief arrived within three minutes and gave the second and third alarms together, indicating fire out of control. The entire department responded.

The Georgia from its berth at the shore dock between Pier 40 and Pier 41 proceeded towards the Kekoskee. The flames soon covered practically all of the starboard side of the Kekoskee forward of amidships. The fire swept from underneath the dock and up the side of the vessel and as high as 90 feet. The paint on the forward mast of the Kekoskee, 90 feet high, was burned. All of the crew of the Kekoskee left the ship, practically in a body, taking their effects, and ran 300 to 500 feet from the vessel, except 4 men in the engine room. The first mate and pump man and two others returned. The first mate cut the spring line and he and the pump man ran to the stern where there was no fire, and shouted to the Georgia for help. The Georgia already was moving to position for the Kekoskee and maneuvered well under its stern. A line was given by the pump man and made fast to Georgia at approximately 1:48. Approximately 90 feet of line was given. The Georgia moved ahead. The stern line of the Kekoskee was cut on the dock by the second mate. The Kekoskee moved from its moorings and diagonally across the slip. After the vessel had moved, its stern being approximately even with the bow of the Montauk lying opposite at Pier 41, the wheel of the Kekoskee turned on reverse and then ahead and stopped, and by this action the Georgia was better able to straighten the ship in the channel and towed it to the open waters of the bay, the engines of the Kekoskee then giving assistance. The oil hose from the Kekoskee to the dock had not been disconnected, and moving the ship broke the hose, spilling some oil on the wharf and water beneath on the starboard.

Opposite the slip, 350 feet wide, at Pier 41, was the steamship President Pierce, 517 feet long, its stern just forward of the bow of the Kekoskee. Approximately 1,000 feet astern the steamship President Pierce, at Pier 41, berthed the Montauk. Approximatly 550 feet astern the Kekoskee at Pier 40 was berthed, bow shoreward, the San Felippe. To its port side were fastened three scows, one on port bow, one abaft the beam and forward, and one at port quarter. To the port quarter and port bow posts, respectively, of the two first named scows, was another scow fastened by lines to its respective starboard

bow and starboard quarter posts. Between the San Felippe and the Kekoskee at Pier 40 were four booms of logs, the nearest boom to the Kekoskee being approximately 120 feet astern—all as shown by the inserted rough sketch.

The Surveyor stood by. It had the equipment necessary for service, but did not render any help.

As the Kekoskee was moved out of the slip by the Georgia, the Alki, city fire boat, entered the slip and proceeded to the dock. Another fireboat, the Duwemish, soon appeared. The fire on the dock was under control within half an hour. Flames were burning on the woodwork and the awnings on the starboard side of the Kekoskee as it moved away from the dock and down the slip. The hose of the Kekoskee was immediately played on the fire by the men on board, and the fire was all out on the ship soon after reaching the open waters of the bay. The heat of the tank, when water was put on the top by the hose, caused steam to rise.

The cost of the repairs on the Kekoskee is $5,277.14.

The services rendered by the Georgia and its crew were prompt, skillful, and efficient, and are of a high order. The apparent risk at the time of service was great. The men, especially, were exposed to grave danger. The risk was knowingly assumed; a placard fastened to the hand railing at the stern of the Kekoskee said "Danger Discharging Gasoline." And the crew was also advised by some of the Kekoskee crew as the Georgia passed to berth at the dock at the inshore end of the slip. The explosion of gasoline or oils would no doubt have carried burning oil which, contacting the body of the men, would have been very serious, while not so serious to the tug. These men demonstrated the sentiment expressed by La Bruyere: "There is nothing of which men are so fond and withal so careless as life." This is emphasized when we realize that, under the same conditions, the crew, except four, of the Kekoskee, left the ship, and the Surveyor went full speed away. And this is not intended as a criticism of that conduct. The Kekoskee was not in danger of destruction after it was moved from the dock and danger of explosion removed, the Surveyor standing by, the fire companies of the city affording relief, the fireboats being shortly available, but the inception of the rescue presented an exigency of extreme hazard. There cannot be much, if any, doubt that, if the vessel had not been removed, the intense heat would have caused spontaneous combustion in the oil tanks. The heated oil in the tanks (100 degrees Fahrenheit) for the purpose of pumping, added to the intense heat against the steel tanker, would soon have exploded the tanks.

If an oil tank had exploded, the Kekoskee and many lives, no doubt, would have been destroyed, especially those on board the tanker as well as the dock, and the crew on the tug would have been very seriously burned, if not killed. Shakespeare in "Macbeth" said: "Life is but a walking shadow"; and Carlyle: "A thawing iceboard on a sea with sunny shore." It has been likened to changing and shifting ocean tides that ebb from shore to shore. Roswell D. Hitchcock said it is "but the immediate breath we draw," and we are ever reminded that "sorrow lends but weak relief to him that bears affliction's cross." And Bacon said: "O, Life! an age to the miserable, a moment to the happy."

It is obvious that the value of the five men and the risk to incapacity for life and welfare was much greater than the value of the tug or danger to its damage or destruction. The court in The Llewelyn J. Morse

(D. C.) 30 F.(2d) 402, at page 406, awarded a seaman a total recovery of $28,541 for injury. This has not been modified by any court. This was not a salvaging case, but is referred to only to show the value of unimpaired life. Of course the tug is inanimate, and the seamen, animate, and with Fielding in "Tom Thumb," act 3, part 1, we may say: "When I am not thanked at all I am thanked enough. I've done my duty and I've done no more"; and with George Eliot: "Not liberty, but duty is the condition of existence," or "the reward of one duty is the power to fulfill another"; or with Hazlitt: "The last pleasure of life is the sense of discharging our duty"; or with La Bruyere: "They do well, or do their duty who with alacrity do what they ought"; or with Webster, in the Knap murder trial, 1830: "A sense of duty pursues us ever. It is omnipresent like the Deity."

The purpose of salvage is compensatory, to inspire the saving of property and inspire the assumption of risk perhaps beyond the duty of life; and this service must be voluntary, and the reward must be sufficiently large to inspire salvors to take the required risks.

The instant service is one service. The tug or crew alone would have been impotent. These libels have been consolidated. Usually each case must rest upon its own facts. This case is distinguished from all cases in the books.

A total award of $11,000 is made; and this should be divided: To the Georgia, $4,750; and to the participating members of the crew (the captain was absent) $6,250, in equal portions. The risk was to life or serious injury, and this was equal, and the recovery should not be in proportion to the wages received. Nor has the rule dividing the award, three-fourths to the tug and one-fourth to the crew, application.

The award has been lessened by the grossly exorbitant demand by the crew in the ship's arrest, $150,000, and also the excessive claim of the tug, one-fourth of the ship's value "or such amount as the Court shall allow." $60,000 bond was furnished for the tug's claim, and $150,000 bond for the claim of the crew. While it is said the amounts were agreed to, it cannot be denied that the demands were grossly exorbitant. In the George Gordon, 5 Asp. N. S. 216, 9 Probate, Divorce & Admiralty Cases, p. 46 it is said: "Parties should not arrest a ship for an exorbitant sum; but if they do so it is no excuse to say that the defendants did not, as it were, struggle to get free by applying to have the bail reduced, nor that the solicitors were ignorant of the facts of the case at the time of the arrest. Where it is possible, they should ascertain circumstances before the ship is arrested. I never will sustain the course taken in this case, and I therefore order that the plaintiffs do pay all the costs and expenses to which the defendants have been put by finding bail." See, also, The Alamo (C. C. A.) 75 F. 602, 603; The Cherokee (D. C.) 31 F. 167.