THE MONTICELLO.

PACIFIC IMP. CO. v. HATCH.

(District Court, N. D. California. May 3, 1897.)

1. SALVAGE—DEGREE OF DANGER—COMPENSATION.

That a vessel is in part disabled, and that the state of the wind and sea is such as would in time probably cause her to drift ashore, is no ground for greatly increasing the compensation, when it is certain that assistance would in any event have reached her before the danger became imminent.

2. SAME—SALVAGE SERVICES—COMPENSATION.

Where a steamer with a disabled boiler was proceeding under a jib sail, and was in no danger of going ashore before assistance sent for would arrive, held, that the taking of her in tow by a passing steamer, in the ordinary weather of the season, if a salvage service at all, was of a very low order, and, the time consumed being some five hours, the sum of $350 would be allowed; the salving vessel being worth with her cargo about $445,000, and the salved vessel about $12,000.

3. SAME—TOWAGE COMPENSATION.

The towage into port of a disabled vessel by a freight or passenger steamer, which is necessarily delayed somewhat thereby, even if under circumstances scarcely rising to the dignity of a salvage service, will be compensated at a somewhat greater rate than that of mere towage by tugs intended for the purpose.

Libel for salvage services. Stipulated value of Monticello was $12,000. She had no cargo or passengers, and was out of commission. She was in no particular or immediate danger, and tugs from San Francisco were on their way up the coast to tow her, and would have reached her some four or five hours after she was taken in tow by the San Benito. The Monticello was disabled, her boiler having become broken down, and she was being navigated with but one sail,—the jib. She was from 8 to 15 miles from the coast. The service lasted about seven hours and a half. No dangers or risks attended' the performance of the service. Three hundred and fifty dollars allowed as salvage.

J. E. Foulds, for libelant.
Thos. D. Riordan and Edward Lande, for claimant.

MORROW, District Judge. This is a libel for salvage services alleged to have been rendered the steamship Monticello on July 25, 1895, by the steamship San Benito. The claimant contends that the services rendered were simply towage services. The libelant contends, and introduced testimony tending to show, that the steamship San Benito was on her regular voyage from Tacoma, in the state of Washington, to the port of San Francisco; that at about 2:30 in the morning of July 25, 1895, while on her course between Point Arena and Point Reyes, about 100 miles from the port of San Francisco, lights were observed by those on board the San Benito, which were taken to be signals of distress; that upon investigation it was discovered that the steamer Monticello was disabled, her boiler having broken down; that at the time the wind was strong from the west northwest, and a rough sea was running, and it is claimed that the Monticello was in imminent danger of being driven ashore; that after several unsuccessful attempts a boat was lowered from the San Benito, and a tow line sent aboard the Monticello, which was made fast to the tow rope, and the disabled vessel was taken in tow by the San Benito, and successfully towed into San Francisco. It is further claimed that the service rendered to the Monticello was unusually hazardous, and that, in addition to the risks thereof, the voyage of the San Benito was delayed so that when she finally arrived at the port of San Francisco the tide had ebbed to such an extent as to make it impossible for her to reach her dock, by reason whereof she was compelled to anchor in the stream, and did not reach her dock until 11 a. m. next day, thereby losing some 20 hours' time. The claimant, in support of his contention, introduced testimony tending to show that the services rendered were simply towage services; that the Monticello was never at any time in a position of immediate danger or peril; that one of her boilers gave out; that it would have taken some 10 or 12 hours to have fitted up the other boiler for use; that the accident took place about abreast of Mendocino City, some 25 or 27 miles north and west of Point Arena, and that the vessel was about 18 miles from shore; that a drag was rigged up, and the vessel laid to until after daylight, when the drag was taken in, and the jib set, and the vessel kept on her course; that she was spoken by different vessels, some

going in opposite, and others in the same, direction; that assistance was offered, but declined, the captain of the Monticello stating that he simply wanted a tug,—to report him for a tow in San Francisco; that such signals as were set or made were intended only for the purpose of getting a tug, and not because the vessel was in any particular or immediate danger; that the gasoline schooner Bessie K. offered her assistance, and made some efforts to tow the Monticello, but gave it up after her lines had parted, and left the disabled steamer when she observed the steamer San Benito near by; that the latter vessel was first observed by those on board the Monticello between 2 and 3 o'clock of the morning of July 25, 1895, having been attracted by the lights displayed by the Monticello; that she came up and inquired what was wanted, and that the captain of the Monticello said he wanted a tug; that, owing to the wind and mist then prevailing, no answer was heard; that the San Benito disappeared in the mist; that about 7 o'clock the San Benito again came up, and after some maneuvering got a line on board the Monticello; that this occupied the best part of an hour, and the actual towing began about 8:30 o'clock; that there was little difficulty, and no particular danger, in getting the tow line aboard; that the towing took about seven hours and a half, and that the vessels reached the port of San Francisco about half past 2 in the afternoon of the same day; that the towage was unattended with any perilous or dangerous features. In the amended answer the claimant tendered the sum of $200 as payment in full for towage services.

The important question to determine is whether the services rendered were salvage or towage services. It would be useless to take up time in attempting to reconcile, if, indeed, such could successfully be done, the variances between the witnesses on both sides. I am of the opinion that both sides have, perhaps in some particulars unconsciously, exaggerated their version of the situation. To determine the true state of facts is attended with no little difficulty. After a careful consideration of all the circumstances of the case, I do not think that the Monticello was in any great, imminent danger, at the time she was taken in tow by the San Benito, of going ashore. It is true, she was disabled, and that she could do but little more than keep her steerageway, under the conditions then existing, her sailing powers being limited to her jib. There is a direct conflict between the witnesses as to how close the disabled steamer was to the shore, it being testified by the witnesses for libelant that she was at times as near as 5 miles to the shore, and by those for the claimant 15 miles at the most. It was probably somewhere between the two extremes, varying as the vessel drifted. The wind was W. N. W., which would tend to cause her to drift towards the shore. But that the weather was unusually rough or dangerous I do not think is satisfactorily established by the testimony. It was the usual weather prevalent at that time of the year on the Pacific coast. That it was such as would in all probability have driven the Monticello ashore before the arrival of the tugs which had been sent for, and which, it is in evidence, reached the Monticello a few hours after she was taken in tow by the San Beni-

to, is certainly not supported by any reasonable view to be taken of the testimony. The towing began about 8:30 o'clock, according to the captain of the Monticello. The tugs came up between 12 and 1 o'clock. So that the conclusion is inevitable that, even if the wind and sea were such as to cause a drift of the disabled steamer towards the shore, yet it was not sufficient to place the vessel in danger of going on shore before the tugs would have come up. Although the Monticello was first discovered by the San Benito about 2 o'clock a. m., she did not begin to tow the vessel until some time between 7 and 8 o'clock, according to the captain of that vessel, and meanwhile, during the five hours that elapsed, it does not appear that the drift of the disabled vessel was such as to excite any grave apprehensions for her safety under the conditions then existing. It appears, from the testimony of the captain of the San Benito himself, that at 7 o'clock the wind and sea had subsided. That other assistance was then near at hand is, as stated, clearly established by the testimony. The effect of this proof is, of course, to reduce the merit of the services rendered by the San Benito. It is always considered by courts of admiralty an important element in fixing the compensation to be awarded. The Suliote, 5 Fed. 99; The O. C. Hanchett, 22 C. C. A. 678, 76 Fed. 1003; The H. B. Foster, Fed. Cas. No. 6,290; The Saragossa, Id. 12,334. The port of San Francisco was about 100 miles away. Powerful, swift, and thoroughly equipped tugboats were there, ready at a moment's notice to respond to the call for a tow,—particularly to a vessel in a disabled condition. The towing service of the San Benito consumed from 7 to 8 hours, and covered about 80 miles. It was unattended with any risks or dangers to either vessel. It is claimed, however, that the San Benito shifted a part of her cargo in maneuvering for the purpose of passing a line to the Monticello. I do not think that the evidence justifies the inference that this shifting was of any serious consequence. It certainly did not interfere with the towage. Her cargo consisted of coal, and such shift of a portion of it as occurred seems to have been very easily remedied. It is further contended that the San Benito was delayed some 5 hours while lying by the Monticello, and that for that reason she could not reach her discharging place before the tide had ebbed that day, which necessitated a further delay of some 20 hours, causing a loss of a day's earnings, which amounted to between $600 and $700. The stipulated value of the Monticello is $12,000. She had no cargo or passengers. She was out of commission, and was simply being brought down from Seattle, Wash., to the port of San Francisco. She was built in 1892; had a net tonnage of 174.92; was 114.6 feet in length, 22 feet in breadth, 8.8 feet in depth, and was a single-screw steamer. The San Benito is an iron-screw vessel, her registered net tonnage being 2,810.67; she is 340 feet in length, 17.07 feet in depth, and has a beam of 41 feet. She carried on this particular voyage 4,700 long tons of coal. Her value was about $425,000, and that of her cargo about $20,000. Her average daily earnings, as stated, amounted to between $600 and $700 per day. No agreement was entered into between the masters of these two vessels as to the compensation to be given for the service. One of the most difficult and trying ques-

tions which courts of admiralty have to deal with is in determining whether a service rendered to a vessel is, under the particular state of facts presented, a towage or a salvage service. The line of demarkation between the two, under certain conditions, is exceedingly vague and uncertain. The difficulty which underlies the whole proposition is well stated by Mr. Chief Justice Waite, sitting as circuit justice, in the case of The Emily B. Souder, 15 Blatchf. 185, Fed. Cas. No. 4,458. He says:

"Care should be taken, in cases of this kind, not to establish a precedent which will tend to discourage merchant steamers from rendering assistance at sea when there is real or apparent danger, but it is equally important not to encourage claim for salvage remuneration when only towage service is required or contemplated."

Under the facts of the case cited, which are very similar in their general features to those in the case at bar, the services were held to be towage, and not salvage, and the sum of $1,000 was allowed on property valued at $250,000. I am of the opinion that the service rendered in the case at bar, if it can be deemed a salvage service at all, is of a very low order. The Monticello was not in any immediate peril or danger, nor does the evidence indicate that she would have been in a dangerous position before the arrival of the tugs which had been sent for. The San Benito did not experience any risk or peril in rendering the service, and beyond a delay of five hours, a slight shift of her cargo, the chafing of her hawser, and the loss of some rope, does not appear to have suffered any particular inconvenience. It was testified that the charge for towage services by a tug from the locality where the San Benito towed the Monticello would be from $125 to $250. The claimant has tendered the sum of $200. I am of the opinion, however, that, under the circumstances, the San Benito is entitled to more than the amount tendered, and something more than the ordinary towage compensation. As is well said by Mr. Chief Justice Waite in The Emily B. Souder, supra:

"While the employment was for towage alone, it does not necessarily follow that the Monterey is confined, in her recovery, to an amount which would be considered a reasonable compensation for the same service by a tug fitted for and engaged in that kind of business. She is entitled to a reasonable remuneration for what she has done. Her service was an unusual one. The towage was not ordinary, but extraordinary. It interfered with the business in which she was engaged. She went out of her way to see what was wanted. This involved delay, and delay increased the expenses of her voyage. To some extent, it interfered with her business and incommoded her passengers. Under such circumstances, it is clear that neither party could have understood that the ordinary charges for towing would be a sufficient remuneration for what was to be done. As the service was to be extraordinary, it is fair to presume that it was expected the compensation would be something more than ordinary. This, not because the service was for salvage, but because of its unusual character as towage."

This reasoning is peculiarly applicable to the service rendered in the case at bar. I shall allow the sum of $350, which amount will cover the damage done to the hawser, and the loss of the rope. A decree will be entered in accordance with this opinion.