## THE HESPER.[1]

### (*District Court, E. D. Texas.* April 21, 1883.)

**1. SALVAGE.**

Where a vessel grounded in the Gulf of Mexico, near Galveston, and a tug came to her relief, and after pulling at her for part of a day refused, when requested, to take one of the ship's anchors out to sea, so that the stranded vessel might use her own engines by pulling on it, because it was dangerous to try to do so; and it being proved that if that had been done the ship would have probably been able to pull herself off two days sooner than she was relieved: *held*, that such refusal would justify a material reduction of the salvage award.

**2. SAME—AWARD.**

The sum of $8,000 was awarded to two tugs and a schooner for pulling off the grounded vessel, where the labor was light; the promptitude, skill, and energy of the sailors not very apparent; where there was no impending peril nor risk incurred by the sailors; and the property salved was worth $100,000.

In Admiralty.

*Ballinger & Mott*, for libelant.

*Waul & Walker*, for claimants.

MORRILL, J. The definition of salvage by Mr. Associate Justice STORY is as follows:

"Salvage is a compensation for the rescue of property from present, pressing, impending perils, and not for the rescue of it from possible future perils. It is a compensation for labor and services, for activity and enterprise, for courage and gallantry actually exercised, and not for the possible exercise of them which, under other circumstances, might have been requisite. It is allowed because the property is saved, not because it might have been otherwise lost upon future contingences. Subsequent perils and storms may enter as an ingredient into the case, when they were foreseen, to show the promptitude of the assistance, and activity and sound judgment with which the business was conducted, but they can scarcely avail for any other purpose." *The Emulous*, 1 Sumn. 216.

"Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea, or in rescuing such property from actual loss." *The Blackwall*, 10 Wall. 12.

"Remuneration for salvage service is awarded to the owners of vessels on account of the danger to which the service exposes their property, and the risk which they run of loss in suffering their vessels to engage in such perilous undertakings." Id. 13.

---

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.
See *post*, 696.

" The ingredients of a salvage service are—*First*, enterprise in going out in tempestuous weather to assist a vessel in distress, risking their own lives to save their fellow-creatures, and to rescue their property; *second*, the degree of danger and distress from which the property is released, as when in imminent peril; *third*, the degree of labor and skill of salvors; and, *fourth*, the value of the property saved. * * * Risk, enterprise, and disinterestedness are necessary characteristics of every salvage service. * * * When none of these requisites occur, the service deserves little better than a mere remuneration for work and labor." Desty, Shipp. & Adm. 313.

In this case the steam-ship Hesper, of the value of $100,000, having a cargo of salt of the value of $5,000, drawing 13 feet 9 inches of water, grounded in the gulf near Galveston on the twelfth of December, 1883, in 12 feet water. The consignee of the ship in Galveston, on learning of the accident, employed the tug-boat Estelle to go to the relief of the Hesper. On her arrival the captain of the Hesper asked the captain of the Estelle what he would charge to draw the Hesper into deep water, to which the captain of the Estelle replied, "I can't make any bargains, for I don't know how much labor and how long it will take me." The Hesper was heading about N. E., and lying parallel with the nearest land of Galveston island. There was a slight breeze blowing from the S. E., and the sea was somewhat smooth. Under the directions of the captain of the Hesper the Estelle began to pull at the stern of the Hesper, and after tugging for some time, and without success, the hawser was shifted to the bow of the Hesper, and the Estelle employed still unsuccessfully for some time in endeavoring to move the ship. The time thus employed was about four hours. The captain of the Hesper then requested the captain of the Estelle to take one of the large anchors of the Hesper out to sea in order that he might use the engines of the Hesper in pulling her into deep water, to which request the captain of the Estelle replied that he could not do it because it was dangerous; thereupon the Estelle left, it being about 9 o'clock at night. At this time the wind had increased somewhat, and the sea was somewhat rough. After the Estelle left the captain of the Hesper carried out two kedge anchors, attached by hawsers to the starboard bow, and by the engines of the Hesper moved her from two or three points to the east. This was about 10 o'clock at night and the sea somewhat lively. The Estelle drew 8 feet 8 inches, and, as before stated, the water around the Hesper was 12 feet deep, the wind blowing at right angles with the length of the Hesper.

On the third day afterwards the Estelle and another tug, called the Buckthorne, owned by the same parties that own the Estelle, came to the relief of the Hesper. The Buckthorne arrived first, bringing about 25 men, having a schooner in tow, for the purpose of discharging and jettisoning a part of the cargo of the Hesper, which consisted of salt. The Hesper brought a large anchor and cable, also a hawser belonging to the Hesper,—the anchor and cable being the property of the Estelle. The anchor was dropped at the distance

of the length of cable and hawser, and used by the Hesper's engines; and the two tugs, in connection with the Hesper, in a very short time floated the ship. The ship had jettisoned one third of her cargo. There is a discrepancy between the testimony of the witnesses on the part of plaintiff and defendant as to the strength of the wind at the time the Estelle left the ship on the first night, and also as to the roughness of the sea, as well as to the supposed danger that would be incurred by the Estelle in receiving a large anchor off the Hesper.

It will be recollected that the Estelle drew 8 feet 8 inches, and the water was 12 feet deep on the leeward side of the Hesper, and that the Hesper was aground, therefore it may be questionable whether it would be dangerous or not for the Estelle to approach the Hesper on the leeside and receive the large anchor. There can be no doubt that if the Estelle had taken the anchor, as requested by the captain of the Hesper, and thus enabled the engines of the Hesper to act in conjunction with those of the Estelle, that the ship would have floated on the first night.

By the testimony of plaintiff the Estelle would some days make a profit of $300 per diem. Further, it seems that after the Estelle parted from the Hesper on the first night it was discovered that she was somewhat injured, as was supposed, in her attempt to pull off the Hesper. It further appears that at that season of the year the prevailing winds were from the S. E., and would have a tendency to drive the ship further on shore. Such we believe to be the material facts in the case.

The first question that arises is, were the services performed by the tugs salvage or towage? By the definitions heretofore given of salvage, incurring danger is one of the attributes of salvage. The only possible danger on the part of the tugs was the reception of the anchor from the Hesper on the first night. This danger, if it were such, was declined by the Estelle. If, as is contended on the part of the plaintiffs, there was danger to the Hesper by the apprehended storms, the greater was the obligation on the part of the Estelle to allow no delay in doing everything possible to relieve the Hesper from her dangerous situation on the first night; but this she refused to do because of the alleged danger. The Estelle, therefore, on the first night did not perform any salvage service, for she did not incur any danger; and, what is still more, she did not relieve the Hesper from any impending danger, if any such there were. On the arrival of the two tugs afterwards there was no danger incurred and none apprehended, and if the services performed by the tugs could, by any circumstances, be called salvage services, it was salvage of the lowest degree, closely approximating a *quantum meruit*.

In the *Blackwall Case* it is stated that the following circumstances are the main ingredients in determining the amount of reward to be decreed for salvage service: (1) The labor expended by the salvors

in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in rescuing the property from the impending peril; (5) the value of the property saved; (6) the degree of danger from which the property was rescued. Such are the words of the supreme court of the United States, and we are bound by them.

As relates to the first ingredient,—"the labor expended by the salvors in rendering the salvage service,"—the labor was evidently light.

Of the second, "the promptitude, skill, and energy displayed in rendering the service and saving the property" are not very apparent, when we take into consideration that after the labor of three or four hours on the first day, no services were performed until the third day.

As to the fourth ingredient,—the risk incurred by the salvors in rescuing the property from the impending peril,"—there was at the time no impending peril.

The value of the property rescued is the same in amount as that in the *Blackwall Case*. In that case the danger from which the property was rescued was imminent, and there was certainly some risk incurred by the salvors in placing their ship beside a ship on fire. In that case $10,000 were adjudged by the district court to be the amount of salvage on the vessel and cargo, valued at $100,000. The supreme court affirmed the judgment. In this case the value of the property rescued from circumstances of much less peril is said to be the same as that of *The Blackwall*. The greatest award possible in this case could not exceed $10,000.

In consideration of the facts in this case, in connection with those relating to *The Blackwall*, I have come to the conclusion that had the Estelle complied with the request of the captain of the Hesper, and taken one of the Hesper's anchors and planted it in such position that the Hesper's engines could have been used in conjunction with those of the Estelle, and in so doing had relieved the Hesper, that the Estelle would be entitled to the same amount of salvage that was awarded in the case of *The Blackwall* to-wit, $10,000; but inasmuch as this was not done, and thereby a portion of the cargo of the Hesper was jettisoned, that the salvage should be less. I therefore consider that the salvage in this case should be $8,000; that $3,000 of the same be awarded to the owners of the Estelle, and the same amount to the owners of the Buckthorne, and $2,000 be awarded to the schooner, and the men employed to load the schooner and jettison the cargo.

It being understood that the claims of the schooner and the 25 men have been settled by the ship Hesper the $2,000 above decreed will remain to the owners of the ship