THOMPSON v. ONE ANCHOR AND TWO ANCHOR CHAINS (BROTHERTON et al., Interveners).

(District Court, W. D. Wisconsin. January 26, 1915.)

1. SALVAGE ☞4—DERELICT—ABANDONMENT.
    Where a vessel lost her anchors and chains during a storm in Lake Superior, but on the next day the agent for the owners and insurers made an arrangement with libelant for their attempted recovery, they were not derelict.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 7–11; Dec. Dig. ☞4.]

2. SALVAGE ☞7—NATURE OF SERVICE—RECOVERY OF LOST ANCHOR.
    Services rendered in the recovery of an anchor and chains lost by a vessel during a storm, induced by an offer by the agent of the owners to pay half their value if recovered, held a salvage service.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 13, 16, 26; Dec. Dig. ☞7.]

3. SALVAGE ☞38—INDEPENDENT SALVORS—DIVISION OF AWARD.
    In the absence of any proven agreement between them, salvors who engage independently in an attempted salvage and co-operate in its successful accomplishment are entitled to share equitably in the salvage award according to the expense incurred and time expended by each.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. ☞38.]

In Admiralty. Suit by Horace H. Thompson against One Anchor and Two Anchor Chains, with Brotherton and Poissant as intervening libelants. Distribution of salvage award.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

H. R. Spencer, of Duluth, Minn., for libelant.

John H. Norton, of Duluth, Minn., for intervening libelants.

SANBORN, District Judge. The sum of $511.04 has been agreed upon by the claimant and libelant and intervening libelants as the amount to be paid for recovering the anchor and chains. This amount has been paid into court by claimant, and the contest is between libelant and intervening libelants over the division of the fund.

Saturday, June 27, 1914, the barge George E. Hartnell was blown ashore near the Duluth entry during a storm, and lost her anchors and chains in Lake Superior about a half mile from the shore. Sunday morning libelant met Capt. Kidd, who represented the insurance people and owners, and asked him what he would give for recovering the anchors and chains. Kidd replied that he would give him half what they were worth if he recovered them and took them to the Superior shipyards. Libelant Thompson, and Jefferys, who worked for him, started dragging for the anchors and chains the following Tuesday morning, and worked until Friday noon, when by reason of the heavy sea they were compelled to give up the work, and spent that afternoon painting their launch. While painting the launch, Brotherton and Poissant, intervening libelants, were working across the slip from them, and Brotherton had a conversation with Thompson with reference to what Thompson would pay him if he located the anchors and chains; Thompson claiming that he offered $50 for doing so, and that Brotherton accepted the offer. Brotherton admits the offer was made, but claims he rejected it.

Thompson and Jefferys resumed the work of dragging on the next day (Saturday), and Brotherton and Poissant began dragging Saturday morning. Thompson and Jefferys were at work at the enterprise seven or eight days, including all night Saturday night. Thompson had his diving outfit, diving scow, launch, and a derrick scow that he borrowed. He twice went down in his diving suit and fastened a cable to the chains. Afterwards he went down again to search for one of the anchors, which was not recovered. He testified the current price charged by divers for doing such work is $50 a day; that he paid $20 for two tugs, $2.50 a day for the extra man he hired, and $3 a day to Jefferys, but had kept no track of how much he had paid out for wages; that the value of his launch was $25 a day.

Brotherton and Poissant worked four days, including all night Saturday night, and were the ones who actually located the anchor and chains. They testified they paid for tug and scow $87.50, and for launch and derrick $50; total, $137.50.

The efforts of libelant and interveners resulted in the recovery of one anchor and two chains. Three questions arise: (1) Were the anchor and chains derelict? (2) Was the service performed by Thompson on the one part, and Brotherton and Poissant on the other, salvage service? (3) Was there an agreement between Thompson and Brotherton as to compensation to be paid by the former to the latter for locating the anchor and chains?

[1] 1. Property, to be derelict, must be abandoned by the owner without intention to return to the same. In Marvin on Wreck and Salvage, § 124, it is said:

"In determining the right of salvors, it is necessary in certain cases to determine whether the property saved is a derelict, in the sense of the maritime law. When a vessel is found at sea deserted, and has been abandoned by the master and crew, without hope or intention of returning and resuming the possession, she is, in the sense of the law, derelict. In like manner, goods abandoned at sea by the master and crew, without the hope or intention of returning and resuming the possession of them, whether flotsam, jetsam, or ligan, are derelicts. But where the master and crew leave the vessel or goods temporarily, without any intention of a final abandonment, but with the intention to return and resume the possession, such vessel or goods are not considered as legal derelicts."

Section 126:

"Where the vessel is left without any intention—where there is no animus, no spes, either way—as where the master and crew of a schooner instinctively jumped on board a ship in a collision, and were carried off against their will, it was held that the schooner, although found by the salvors without any person on board, and a derelict de facto, was not under these circumstances a derelict de jure. A ship, or goods sunk in the sea, are commonly derelicts; but they are not so as long as the owner continues to assert his claim and does not give up his intention of resuming the possession. The Barefoot, 1 Eng. L. & Eq. 661; 1 Story, 326; The Thetis, 3 Hagg. 14."

The evidence shows the anchors and chains were lost June 27, 1914, and on the next day libelant made an arrangement with Kidd, representing the owners and the insurance people, to search for the property. This is corroborated by Brotherton, who testified to a conversation with Kidd on Monday morning:

"I asked Kidd if he had made any agreement with Thompson about the anchors and chains. He told me that he told Thompson that if he located those chains and anchors and landed them in Superior that he would give him half what they was worth, and if he didn't locate them he wouldn't give him anything for the time he hunted for them."

Poissant testified:

"Q. Do you remember a conversation you had when you fellows came through the canal on the boat? A. Yes, sir; I spoke to Mr. Thompson about what kind of an agreement he had with the insurance company. Q. What did he say? A. He said Kidd told him, if he went out there and found them, he would do the fair thing with him."

It thus appears that the owners had not abandoned the property without any intention of returning and resuming the possession, but at once took steps for its recovery.

[2] 2. As to whether the service performed was salvage service: In Norris v. The Island City, Fed. Cas. No. 10,306, the court said:

"Salvage is the compensation allowed to persons by whose assistance a ship or its cargo has been saved, in whole or in part, from impending peril on the sea, or in recovering such property from actual loss, as in cases of shipwreck, derelict or recapture." The Blackwall, 10 Wall. 1 [19 L. Ed. 870]; The Hesper [D. C.] 18 Fed. 692; Marvin, Wreck and Salvage, § 97; 35 Cyc. 719.

"Three elements are essential to a valid salvage claim: (1) A marine peril. (2) Services voluntarily rendered, when not required as an existing duty or from a special contract. (3) Success in whole or in part, or that the service contributed to such success." 35 Cyc. 720; Marvin, Wreck and Salvage, §§ 229, 230.

The "marine peril" consisted in the fact that the anchors and chains were actually lost. If they had been resting on a reef, where they could be seen, they would undoubtedly have been in "peril" of being lost, and the "marine peril" certainly was not diminished or extinguished by the fact they were actually lost. The services were "voluntarily rendered when not required as an existing duty or from a special contract," and the efforts were successful.

Furthermore, the owners and insurance people are making no contest on the subject, but under a stipulation as to the value of the property recovered and the amount to be paid for recovering it have paid into court the amount to be distributed. Under all the circumstances of this case, the service seems to be a salvage service.

[3] 3. The remaining question is as to the agreement claimed by libelant to have been made with intervening libelants to pay them $50. Thompson testified that he told Brotherton "if he went out there and dragged, and hooked onto any of the anchors and chains, I would give him $50; he said, 'All right.' That was all the conversation we had." This is corroborated by Jefferys, who was working with Thompson. Brotherton admits the first part of this conversation, but denies that he said "All right." His version is corroborated by Poissant. Brotherton also testified that Thompson first offered $10 for locating the anchors and chains, and that he replied: "No, sir. Q. What else was said? A. I says, 'I will go and see Capt. Kidd, the insurance agent.'" Then follows the conversation shown above as to the offer of $50. This reference to Capt. Kidd is corroborated by Poissant.

The burden of establishing the offer to pay $50 to locate the anchor and chains, and the acceptance of this offer, is upon Thompson, the libelant, who alleges it. It cannot be said to be established when it is asserted by two witnesses and denied by two witnesses, equally credible. The testimony above quoted with reference to Capt. Kidd indicates that Brotherton and Poissant did not accept the offer, but concluded to make an effort to locate the anchors and chains on their own account and independent of libelant. This is further evidenced by the fact that on the next day, at 9 o'clock in the morning, they went out and dragged for the anchors, and previously engaged a derrick scow and gasoline boat, lines, chains and grapnel. In answer to the question whether they went to drag for the anchors and chains under an agreement with Thompson or on their own hook, Brotherton testified: "Went out on our own hook."

Thompson testified that on Monday morning following the recovery he asked Brotherton if he wanted his check for $50 for his services; that Brotherton replied, "No, sir; I will not settle with you that way;" that Thompson answered, "I will only pay you as I agreed to; that is all I will give you—just what I agreed to pay you." In the meantime one of the anchors had been again lost from its buoy, and on Tuesday Thompson testified he told Brotherton and Poissant he could not find it, "so they said they would drag for the anchor and they would find it. I said, 'All right.' I gave them my little drag, and took the derrick and dragged until nearly 12 o'clock."

After having been informed by Brotherton that he would not accept $50, Thompson had the conversation last above quoted with ref-

erence to the anchor that was still lost, which tends to show that he did not consider the alleged agreement as to the $50 as of much force. He further testified on cross-examination:

"Q. He didn't agree to take $50, did he? A. Well, he didn't say he would or wouldn't. Q. He didn't say anything? A. He said, 'All right.' That's what he said. Q. But you had no agreement with him, either one way or the other? A. No, sir."

He also testified that on Monday Brotherton "said he was going out and pick up that anchor and chain. I offered him $50. He said, 'No; I am going to have part of the salvage on this anchor and chain.' He told me he had been up to see Kidd."

All of the foregoing tends to show that no agreement had been made —that the minds of the parties had not met.

"It is competent for the parties interested to make fair and reasonable contracts touching services to be rendered to the property in peril. A contract to pay, at all events, a sum certain or a reasonable sum for work, labor, and the hire of a vessel, in attempting to save the property, without regard to the success or failure of the efforts thus produced, or whether the property should be saved or not, is inconsistent with a claim for salvage, and when such contract is pleaded in bar, and proved, any claim for salvage will be disallowed. The Independence, 2 Curtis, 350. But in order to constitute a bar to salvage the contract must be express, explicit, and in distinct terms. The William Lushington, 7 Notes of Cases, 362; The Salacia, 2 Hagg. 265; The True Blue, 2 W. Rob. 177. It will not be inferred from loose conversations, nor from a request to go to the assistance of a vessel in distress. In the absence of an express agreement, the law implies that services are to be paid for as such services are usually paid for. In the case of work and labor on land, only the fact of its performance at the request of the defendant is necessary to be shown, because such service is usually reasonably paid for at all events. But services to property in peril on the sea are not usually paid for at all events, though rendered upon request, but only upon the contingency that they save, or contribute to save, the property. In the absence of an express agreement, therefore, the law implies that salvage services are to be paid for as such, and only upon the contingency of a successful result. Ship Versailles, 1 Curtis, 360; The Independence, 2 Curtis, 350; The William Lushington, supra. Services rendered to a vessel in distress upon the sea, in pursuance of a contract to pay for them a stipulated sum at all events, are deemed to be maritime in their nature, and within the admiralty jurisdiction" [citing cases]. Marvin, Wreck and Salvage, § 118.

The following cases are applicable as holding that the court will equitably distribute the amount to be distributed where there is no agreement:

In The Albion Lincoln, Fed. Cas. No. 144, there were five sets of salvors. The facts were similar in some aspects to the case at bar. The bark Albion Lincoln had gone ashore, and the master agreed that Capt. Baker should go to work and save what was possible of vessel and cargo, and be paid a reasonable compensation. In the meantime the schooner Independence, belonging to the libelant, Cromwell, had arrived with a crew of picked men accustomed to such services, and had come to the assistance of the bark. Capt. Cromwell went to see the master of the bark, and the conversation that passed was stated differently by different witnesses. Capt. Baker said he agreed with Capt. Cromwell to be jointly interested with him in the salvage. Cromwell denied this. There was no doubt that Cromwell's assistance was

accepted on some terms, and all went to work to strip the vessel, so far as was proper and prudent, to lighten her. Subsequently other boats arrived, and engaged in the work of saving the vessel and cargo. The court said, at 1 Fed. Cas. 315:

"Coming to Captain Baker's Case, we find that he employed nearly as many men as Captains Cromwell and Cleveland, and one more vessel; but he did not arrive in time to save a great deal of the cargo, and his men were not subjected to the same hardship or severity of labor. I do not find that Captain Baker has made good his demand to share equally with Captain Cromwell, on the strength of a bargain with him to that effect. * * * But Baker's time, expense, and exertions are entitled to be considered in apportioning the salvage, just as Captain Cromwell's time, trouble, and expense connected with the shipping and care of the steam pump are to be taken into account. They were all working for a common object, and to that extent are necessarily interested together, whether they intended to be so or not."

The Sailor's Bride, Fed. Cas. No. 12,220, involved a claim for salvage for attempting to pull a schooner off of the shore, but unsuccessfully. The court held, however, that, as no stipulation had been made that no compensation should be paid unless the schooner was pulled off, the libelant was entitled to something for his services, and allowed one-half of the amount found in the decree. The court said, at 21 Fed. Cas. 160:

"A salvage service is defined to be the compensation allowed to other persons by whose assistance a ship or its loading may be saved from impending peril. This service must be within the admiralty jurisdiction, and may be rendered spontaneously or by request. And it is admitted that salvage is a compensation for actual services rendered. But as, in this case, the vessel remained aground, and the owner was in no respect benefited by the efforts of the master of the tug, no compensation can be claimed on that ground."

The court made the allowance above stated on general equity principles.

In Norris v. The Island City, Fed. Cas. No. 10,306, the court said:

"Salvage is the compensation allowed to persons by whose assistance a ship or its cargo has been saved, in whole or in part, from impending peril on the sea, or in recovering such property from actual loss, as in cases of shipwreck, derelict, or recapture. When the property is not saved, or if it perish, or, in case of capture, is not retaken, no such compensation can be allowed. A different principle, however, applies when the property is actually saved, and more than one set of salvors have contributed to the result. In such cases, all who have engaged in the enterprise, and have materially contributed to the saving of the property, are entitled to share in the reward which the law allows for such meritorious service, and in proportion to the nature, duration, risk, and value of the service rendered."

In Ryan v. The Cato, Fed. Cas. 12,184, the libelant filed his libel after the property had been sold, but while a portion of the proceeds were still in the marshal's hands. He showed that he had discovered the abandoned vessel and taken possession of her; then went to the city of Charleston for assistance, and had no one to leave in possession of the vessel; that upon his return to the vessel he found another person in possession, who would not suffer him to meddle at all with the ship or cargo. The court held that the libelant had been negligent in not taking steps to secure his compensation, but said:

"However, I do not wish that the petitioner should go altogether unrewarded, and, as the remaining half of the proceeds of this sale are in the

hands of the marshal, I decree that the petitioner receive therefrom the sum of $200."

In The Strathnevis (D. C.) 76 Fed. 855, at page 862, Judge Hanford said:

"But there is no inflexible rule which bars from participation in the distribution of an award those who have toiled, incurred expense, suffered losses, and run risks, and thereby contributed towards the success of a salvage service finally completed by others. The cases are numerous in which admiralty courts in this country and in England have apportioned salvage among different sets of salvors, proceeding upon the theory that all who have contributed towards the salving of property are entitled to share in the reward."

Thompson and Jefferys dragged Tuesday, Wednesday, Thursday, Friday, until 10:30 a. m., and Saturday, until about noon. Brotherton and Poissant dragged Saturday from 8 or 9 o'clock until about noon, when they located the anchors and chains. Monday the anchor and chains were loaded on the scow. From Saturday, when the anchors and chains were located, the work was done by all the parties together. Thompson in his diving suit fastened a cable to the chain, Jefferys tended the life line and hose to lower him down, Poissant did the pumping, and Brotherton handled the cable. When the cable was made fast to the chain a buoy was put on the cable, and both launches went ashore for the derrick scow theretofore engaged by Brotherton. The men all worked together, fastening the cable to the anchor and chains. One chain was raised, and it was necessary to cut it because it was "afoul of the other," and this cutting was done by Poissant and Thompson. On Monday Brotherton and Poissant brought one anchor and one chain to the marine yards, and placed it with the chain already brought in, and afterwards Thompson delivered the anchor and chains to the proper place in Superior.

Thompson should be reimbursed amount paid for two tugs, $20, one man one day $2.50, Jefferys eight days, at $3 per day, $24, and should be allowed $100 for diving services; total, $146.50. Brotherton and Poissant should be reimbursed $87.50 paid for tug and scow, and $50 paid for derrick scow; total $137.50. The balance of the fund, $227.04, should be apportioned between them according to the number of days they were engaged; that is, Thompson eight days, and Brotherton and Poissant four days. This will result in paying $151.36 of the balance to Thompson, and $75.68 of the balance to Brotherton and Poissant, or a total of $297.86 to Thompson, and $213.18 to Brotherton and Poissant. The poundage fee of 1 per cent. will be deducted by the clerk from the last two items, leaving the net amount payable Thompson $294.88, and the net amount payable Brotherton and Poissant $211.05.