## THE SANTA ROSA.

### GRACE S. S. CO. et al. v. MERRITT & CHAPMAN DERRICK & WRECKING CO. et al. (GUILDS, Intervener).

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

### No. 2319.

**1. Salvage ⚖️17—Tugs responding to call of stranded vessel entitled to compensation, though more powerful tugs were later called.**

Tugs which responded to the first call for assistance of a stranded ship, and were faithful and efficient about their work, should be reasonably compensated, though they did not meet with success, and it was thought necessary to call in more powerful and better equipped wrecking ships, which were finally successful.

**2. Salvage ⚖️51 — Salvage award disturbed only for violation of principle of law or for manifest error in discretion.**

An appellate court should not disturb a salvage award, unless convinced that some principal of law was violated, or that there was plain and manifest error in exercise of discretion.

**3. Salvage ⚖️30—Award for assistance by several tugs to stranded vessel approved as just and fair to all parties.**

Award of about $50,000 to several tugs, for assistance extending over several days in floating a stranded vessel off Charleston Harbor, approved as just and fair, under the circumstances, to the ship and the several tugs.

**4. Salvage ⚖️30—Allowance to individual superintending entire work of tugs permissible.**

The manager of two of the several tugs which took part in floating a stranded ship having superintended the entire work, a reasonable allowance to him on account thereof was proper.

Cross-Appeals from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Consolidated suits in admiralty for salvage by Robert H. Lockwood, manager of the steam tugs Waban and Cecelia, and others, against the steamship Santa Rosa and cargo and freight money. Decree for libelants (295 F. 350), and the Grace Steamship Company and W. R. Grace & Co., claimants of the steamship and cargo, appeal, and the Merritt & Chapman Derrick & Wrecking Company and another bring cross-appeal. Affirmed.

John M. Woolsey, of New York City (Edwin Serre Murphy, of New York City, and George L. Buist, of Charleston, S. C., on the brief), for appellants and cross appellees.

John W. Griffin, of New York City (Haight, Smith, Griffin & Deming, of New York City, on the brief), for appellees and cross appellants.

Harold A. Mouzon, Arthur R. Young, and Alfred Huger, all of Charleston, S. C. (Lawton & Cunningham, of Savannah, Ga., and Hagood, Rivers & Young and Miller, Huger, Wilbur & Miller, all of Charleston, S. C., on the brief), for other appellees.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WADDILL, Circuit Judge. These are cross-appeals from a final decree of the United States District Court for the Eastern District of South Carolina, dated April 22, 1924, in the consolidated maritime causes brought against the American steamship Santa Rosa, and her cargo and freight money, for salvage services rendered to the vessel by five tugs, the Waban, the Cecelia, the Manomit, the Clincho, and the Hinton, all of Charleston, the tug McCaulley, of Savannah, the tug I. J. Merritt, of Norfolk, and R. H. Lockwood of Charleston. The services were rendered under these circumstances: The Santa Rosa, a large ocean-going steamship of 6,415 tons gross, 404.6 feet long, 53.9 feet beam, and of which appellant W. R. Grace & Co. is claimant, en route from Chili for Charleston, S. C., with a car-

go of 8,750 tons of nitrates in bags on the evening of December 26, 1922, ran aground in a thick fog off Morris Island, near the entrance to the Charleston Harbor; the wind at the time being northerly, and with a smooth sea running. After unsuccessful efforts to float the ship, about 3 p. m., the master, by wireless to the ship's agents at Charleston, requested assistance, and the first-named four tugs promptly responded, the first one arriving about 4:12 p. m., and that evening the tugs made fast to and began pulling, with a view of floating, the vessel. On the early morning of December 27th the Clincho arrived. On the night of the 27th the United States revenue cutter Yamacraw arrived and joined in the work. On the morning of the the 28th the United States naval tug Umpqua arrived, and that night the tug Bison, of Savannah. These vessels, or some of them, with the exception of the Bison, in an effort to float the steamship pulled on her at high tide on five different occasions between the 26th and 28th of December, without avail. On the 29th, the steamship's bow anchors were run out, and lightering of the cargo commenced, and 9,231 bags of nitrates unloaded. On account of low tide on that day, no pulling was attempted.

On the night of December 29th, about 9 o'clock, the wrecking tug I. J. Merritt arrived from Hampton Roads, pursuant to a call sent to her on December 27th, and immediately took charge of the operation, and the tugs aforesaid withdrew, and were then or the next morning dismissed from further service. On the early morning of the 30th, the Merritt, assisted only by the naval tug Umpqua and the tug Bison attempted at high tide to move the ship, but could not do so. Lightering of the cargo was continued during the morning of December 30th, and that evening, about 4 or 5 o'clock, another pull was made, also without result. Lightering was again resumed, and continued until 9 p. m. On the 30th, 4,067 bags were lightered ashore, making in all about 1,200 tons removed from the vessel. At 4:30 on the morning of the 31st, with the Merritt swinging ahead and the ship heaving on her anchor purchase, the steamship's bow began to swing to starboard, and to move ahead, and at 5:10 that morning the vessel was afloat. At this time, the tide was higher than at any previous period since the stranding, largely brought about by the brisk wind from the northwest, which with the continued lightening of the ship by removal of the cargo, tended to accelerate the ship's release.

The value of the Santa Rosa in her salved condition, and her cargo and freight money and fuel stores, was $744,638.50; the value of the tugs, other than the Merritt, $286,200, as agreed by stipulation, and that of the Merritt $356,269.13. The amount of salvage allowed, including certain expenses in connection with the service, was to the tugs a total of $17,374.90, of which $3,374.90 was for costs and expenses incurred and damage sustained by tugs; also $500 allowed to R. H. Lockwood for services in connection with the undertaking; and to the Merritt the sum of $22,000, and $3,811.76 for expenses and disbursements—making a total of $25,811.76.

These appeals are from the allowances thus made; appellant, claimant of the Santa Rosa, on the one hand, insisting that the allowances as a whole are excessive, particularly those made to the tugs, and that, while the award to the Merritt should not be increased as against the claimant, as between the Merritt and the tugs the award should have been greater in favor of the former, assuming the total award to stand. The Merritt, by cross-appeal, insists that a very much larger award should have been made in her behalf.

[1] The questions presented for our consideration upon these appeals involve as well the reasonableness of the awards made to the several parties as the matter of apportionment between the several salvors. That the services were salvage is not seriously disputed, and certainly cannot be successfully controverted. It is true, having regard to the usual considerations that control in salvage awards, the service cannot be said to be of a high order of merit; but it was, nevertheless, for meritorious service rendered to a stranded ship, exposed to the hazards of the open sea, and by vessels employed on the water in and about the effort to float and extricate her. The demand for the service was urgent, and promptly, faithfully, and efficiently rendered, covering a space of time, day and night, from the 26th to the 31st of December, and it will not do, either because it was not possible to extricate the ship earlier from her perilous position, or because the tugs rendering service at the beginning had not met with success, or that it was believed necessary to call in more powerful and better equipped wrecking vessels, to whistle down the wind the claims of those who diligently performed their duty and happened unaided not to be successful. They did all that could reasonably have been required of them, assiduously and continuously, day and

night; and, while undoubtedly it was within the province of the ship to secure more powerful aid, still, none the less, those who responded to the early call, and were faithful and efficient about their work, should be reasonably compensated.

The maintenance of a wrecking outfit, such as the Merritts fortunately possess, is most desirable, and ought to be encouraged; but it is also true that tugs in the position that libelant's tugs were, are entitled to much consideration, and their services and equipment and ability to render service promptly is of very great importance to the locality, and as much so as that of professional wreckers in the larger harbors of the country, where, by reason of the extent of the business, wrecking concerns like the Merritts can be supported.

The tugs in this case were by no means small, but all large and valuable vessels, most of them carrying large wrecking appliances and equipment especially designed and suited for occasions like the one in question. The Cecelia was 100 feet long, 25 feet beam, 350 horse power, 98 tons gross, valued at $38,000; the Waban, 100 feet long, 20 feet beam, 600 horse power, valued at $60,000; the Hinton, 90 feet long, 19 feet beam, 400 horse power, valued at $28,000; the Manomit, 105 feet long, 600 horse power, valued at $30,000; the Clincho, a large and powerful ocean-going steam tug used in towing barges between Charleston and Havana, 142 feet long, 17.7 feet beam, 800 horse power, valued at $70,000; and the McCaulley, 98 feet long, 24 feet beam, valued at $60,000. These several tugs were manned by experienced navigators, used to service of the kind in question, and were well and appropriately equipped, and the tugs were working in thorough harmony and accord in the service, being placed in connection therewith under the direction and control of Capt. Robert H. Lockwood, manager of two of the tugs, who gave supervision to the whole undertaking.

The services performed were long-continued and arduous, reaching from the evening of the 26th to the morning of the 30th of December, and were appropriately referred to by the judge of the District Court in the statement that "all the tugs acted with promptitude, zeal, and energy, and their action is most commendable." The Merritt was a large ocean-going steam vessel, valued at $356,269.13, a part of the outfit of the well-known Merritt & Chapman Derrick & Wrecking Company, and on the occasion in question, fully equipped and manned for the work in hand, rendered most efficient and effective service, for which it claims a salvage award of $35,000, and on account of which the court allowed $22,000, together with $3,811.76 for expenses, a total of $25,811.76.

The case is somewhat unusual, because of the number of vessels employed and the large number of persons engaged in the service. The record is exceptionally large. The case was tried by a judge who, by reason of his recognized ability and long experience in maritime matters, was especially equipped to pass intelligently and justly upon the merits of the controversy. His opinion filed in the record (295 F. 350) shows that he gave much labor and painstaking and careful consideration to every detail of the case, and passed upon the same, having regard to its many niceties and conflicts of interest, as well between the libelants and the ship, as between the several libelants and interveners themselves.

A careful consideration of this record will demonstrate how difficult the task was, and the intelligence and fairness with which he met the problems. He had necessarily to consider the conflicting interests between the several parties respecting a most difficult question; that is, the fixing of awards in salvage cases, something largely and almost entirely within his judicial discretion; and this court should be slow to disturb what he did.

[2] The law properly controlling in the reduction of and increasing salvage awards in an appellate court is well settled, and we need go no further than cite the recent decision of this court in The Naiwa, 1924 A. M. C. 1435 (C. C. A.) 3 F.(2d) 381, a salvage case from the Eastern District of Virginia, and the cases therein cited. An appellate tribunal should not disturb a salvage award by a trial court, although it may feel that, if sitting on such court, a different allowance would have been made, unless convinced in what was done some principle of law was violated, or there was a plain and manifest error in the exercise of discretion in the conclusion reached.

This court, speaking through Judge Woods, in the Kia Ora Case, said: "Doubt, or even a decided inclination to differ, does not warrant interference with the finding of fact of the trial court, and this is especially true as to the amount to be allowed in salvage cases." The Kia Ora, 252 F. 507, 164 C. C. A. 423.

Considering the claim of the Merritt Company for an increase of the award made to it, from $22,000 to $35,000, we are greatly

impressed by the reasoning of the learned judge of the District Court in reaching his conclusion as to the amount of the award. He says: "The Merritt left promptly for the scene of the disaster and arrived as early as she could. Her value is greater than that of all the other libeling tugs put together, and her equipment incomparably more efficient. It is to her equipment and its use that the extrication of the vessel was chiefly due, and she undertook the work on true salvage basis; if she failed, she lost all the effort cost her. But she did her work in comparatively fair weather, in less than 48 hours, and very much assisted by the lighterage and consequent lightening of the ship. A fair compensation for the Merritt is $22,000, to which must be added her expenses and disbursements, $3,811.76, or in all $25,811.76."

In likewise fixing the amounts of the several tugs, the District Court necessarily gave consideration to the services severally rendered by them; the number engaged; the time they reached the stranded vessel; what they did, and the hours of service performed; the long space of time they were engaged in the actual work, together with the capacity of the several tugs and their officers and crews to do what was required of them; and hence, under the circumstances, we should be careful in substituting our views for those of the judge who had full opportunity to consider the whole case when it was fresh in the minds of all the parties. To do so would probably result in injustice, rather than justice.

[3] From our view the conclusion reached by the trial court was just and fair, under all the circumstances of the case, between all the parties litigant, and none of them has any just cause of complaint. This is especially true so far as the ship is concerned, as to which Judge Smith in his opinion said: "In determining the award in a salvage case the main consideration is danger to the lives of the salvors, and next to their boats and property. In this case there appears to have been no imminent danger to the lives and boats of the salvors, other than that incident to their vocations, the danger incident to the danger of gaining a livelihood on the seas. Nor does there appear to have been much danger to the lives of the ship's crew, or to her hull and cargo. Nevertheless the case is one where a ship and cargo involving nearly $750,000 stranded in the face of the open sea were finally restored to a position of safety, where the one could ply her vocation as a transport in commerce and the other be de-

5 F.(2d)—31

livered to the consignees"—and with which we fully concur.

[4] We should perhaps say in this connection that we see no reason why the libelant Lockwood, having regard to his superintendence of the entire work, should not be made some reasonable allowance on account thereof, and the sum allowed him by the District Court is only a fair charge therefor.

The decree of the District Court will in all respects be approved and affirmed, with costs.

Affirmed.