## THE MELODY.

### RUSTAD et al. v. WUORI et al.

### No. 11341.

Circuit Court of Appeals, Ninth Circuit.

Oct. 8, 1946.

Wood, Matthiessen & Wood, Erskine B. Wood, and Lofton L. Tatum, all of Portland, Or., for appellants.

Jay Bowerman, of Portland, Or., and A. C. Fulton, of Astoria, Or., for appellees.

Before DENMAN, BONE, and ORR, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree in admiralty awarding the owner and crew of the oil screw fishing boat Stampede II salvage for the services of ship and crew on July 24 and 25, 1945, in bringing into the Columbia River from 9 miles off North Head, north of the river's mouth, the wrecked fishing boat Melody.

The salved value of the Melody and her equipment is $17,500. The amounts found as the value of the services and awarded appellee were $2,000 for those of the Stampede II and of her master; $500 each to two of her seamen; $1,000 to one of her seamen, who boarded the wreck and affixed the tow line below water while standing on the Melody's submerged deck with water to his shoulders; and $300 for loss of a cable, for fuel and food consumption and sundries.

The appellants admit some meritorious service was performed by appellees. The sole question before us is whether the award is excessive. The district court heard the testimony of all the witnesses and its findings are here accorded the weight stated in our decision in The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 501. We are of the opinion that not only no manifest error appears but that upon our "examination, thought and judgment" the findings are amply supported by the evidence.

The Stampede II was proceeding to her tuna fishing grounds in the Pacific, a trip occupying several days. The tuna were running and on the next trip her catch grossed $3,000. At about 2.30 p. m. on July 24, she found the wrecked Melody "submerged to a point where only a part of her pilot house, bait tanks, mast and a small part (about 6 square feet) of her aft deck were above water." The Melody's crew had left her, were by that time several miles away on a life raft and out of sight. There was no one to contract for a tow or salvage and it was obviously a no-cure no-pay venture. As in all such cases the question for the master of the Stampede II was whether it meant more for him to gamble on a successful salvage of the submerged vessel or continue on the fishing trip for

tuna during their limited run off the Washington Coast.

■ While the sea was calm, with nothing but ground swells, the towage of the wreck presented peculiar difficulties to the Stampede II. She was not equipped for salvage. The bow of the Melody was under water and the tow line of the Stampede II would have to be affixed to the Melody's stern post with the tow line over her propeller, where it well might foul. There is always the risk that an inexperienced salvor will foul his towing line in his own propeller. The salvor here had to use as a tow line a cable, part of his gear for his nets. Its loss, which in fact occurred, would cause a delay in procuring another and hence his return to fishing in the tuna run. In fact the district court found that as a result of the salvage trip the Stampede II was prevented from resuming her fishing in the tuna run for a week at a loss of from $3,000 to $5,000. In determining whether the salvor would undertake a no-cure no-pay venture, such a loss is properly in the salvor's contemplation.

The tide was ebbing and would continue to ebb until 7.04 p. m. with an offshore set which would increase in intensity as the wreck approached the mouth of the Columbia River with its combined returned tide and river water poured into the Pacific. While the Melody had a wooden hull, her almost completely submerged condition showed that the weight of her motor and power winches and other equipment made her just awash with the likelihood that shifting her position would release pocketed air which contributed to her flotation. There was also a likelihood, which proved to be a fact, that a part of her flotation was contributed by fresh water ice for her catch of fish which, this being of less specific gravity than sea water, when melting would cause her to lower further and perhaps to sink.

There was the paramount consideration whether the wrecked and submerged Melody had any appreciable value worthy of any salvage attempt in the adverse condition of the tide and distance from a landing place in the Columbia River. The cause of her distress was not visible. It might have been an explosion of the gas from her oil tanks which had made her hull valueless.

After the master of the Stampede II had circled several times the Melody and her nets floating about her for any of her survivors, he telephoned by radio to the Columbia River Coast Guard station advising of the situation. As a result a high powered motor boat picked up the crew of the Melody floating in her life raft. The Stampede II'S fisherman boarded the Melody, dragged a cable to her, and affixed it in the manner described above. At this time the Coast Guard motor boat arrived with the crew of the Melody. Though requested, no one of the Melody's crew came on the Stampede II to assist in the salvage and the motor boat left. The tow against the adverse current continued for about an hour and a half, when two Coast Guard lifeboats arrived and, at the request of the Stampede II'S master, they added their lines and brought the Melody the remainder of the way out of the ebb into the flooding tide towards the Columbia. The three vessels continued until about 11.30 p. m. when, at the entrance of the Columbia River jetties in an attempt to shorten the tow lines, the propeller of the Stampede II was fouled by the line of one of the life boats and the Stampede II was compelled to slip her towing cable which was lost. The remaining tow in the aiding flood tide ended in a safe beaching of the Melody on the shore of the Columbia River.

The Stampede II stood by and aided in pumping out the Melody on the next morning. Her master further salved the Melody's catch of tuna and delivered it for marketing before spoiling for approximately $2,000.

■ In these circumstances it appears to us that no question arises as to the propriety of a $2,000 award to the master and owner. As to the awards to the seamen who were required to perform their services at the loss of their lay in a week's tuna fishing, we cannot see that the amounts are excessive.

The decree is affirmed.