**JONCICH et al. v. XITCO.**

No. 11879.

United States Court of Appeals
Ninth Circuit.

March 1, 1949.

McCutchen, Thomas, Matthews, Griffiths & Greene, Harold A. Black, and Philip K. Verleger, all of Los Angeles, Cal., for appellants.

Herbert R. Lande, of San Pedro, Cal., for appellee.

Before MATHEWS and STEPHENS, Circuit Judges, and DRIVER, District Judge.

DRIVER, District Judge.

On January 9, 1947, between 6:30 and 7:00 p.m., the fishing vessel, Pioneer, 183 tons gross and 86.5 feet long, cruising at 8 knots, stranded on a submerged rock ledge about three-quarters of a mile off Laguna Beach, California. She was on the rocks the full length of her keel and

riding high at the bow.[1] An attempt to back her off on her own power failed and a distress call was sent out by radio. The Master of the North Queen, another fishing vessel of 150 tons gross and a length of 82 feet, carrying a crew of ten men, responded to the call and about 7:30 p. m. arrived at the place where the Pioneer was stranded. The North Queen maneuvered bow first to a position near the edge of the kelp bed that surrounded the Pioneer and turned around. By means of the Pioneer's skiff, there was passed from her to the North Queen a manila line fastened to a ⅝ inch cable, the largest one available on either vessel. The cable was pulled aboard and attached to the main bitts aft. In order to preserve the maneuverability of the North Queen, it was necessary to rig the cable in such a way as to keep it clear of the purse seine net on a turn table at the stern. That result was accomplished by attaching to the cable a line from the boom. When the North Queen tried a straight pull, the cable parted, but, by releasing the line attached to the boom, the crew prevented the cable from escaping, and, at the same time allowed sufficient play to keep the rigging from being brought down. The cable was again made fast to the North Queen, and the effort to free the Pioneer continued.

A deck fisherman on the North Queen had served in the Navy, in the Pacific, during World War II, and had acquired special skill, based on extensive experience in freeing landing craft and other vessels, stranded on coral reefs. Under the direction of the Master of the North Queen, he took an active part in the Pioneer rescue operations. He applied a technique, which he had learned in his salvage work in the Navy and instead of making a straight pull, maneuvered the North Queen back and forth from one side to the other in a series of "diagonal tows." In that manner, the salvors succeeded in "squirming the vessel off the rocks." The rescue operations, from beginning to end, consumed about an hour and a half to two hours.

After being pulled free, the Pioneer made port on her own power.

The North Queen had come out to fish for sardines, which were taken only in the dark of the moon. The moon came up at nine o'clock, and the Master and the crew of the North Queen lost their opportunity to fish by going to the assistance of the Pioneer. There was no evidence, however, with reference to the character of the sardine run, or as to whether catches were made by other fishing vessels that night.

Shortly after the North Queen had taken a line from the Pioneer, a third fishing vessel, the Sunlight, 81 feet in length, arrived on the scene in response to the distress call from the Pioneer. The Sunlight had 450 feet of ⅝ inch cable aboard. She stood by until the Pioneer had been freed and, so the Master testified, was prepared to render assistance by attaching another line to the Pioneer if the efforts of the North Queen had not been successful.

Although the night was dark, it was clear, and the sea was calm except for the usual, moderate, ground swell. The Pioneer was on the rocks broadside to the swell and was rocking from side to side. The tide was low at 5:30 p. m. From then until midnight, there was a rise of 5.6 feet. At the trial, there was expert testimony to the effect that the danger to the Pioneer would have increased as the tide came up since she would then respond more freely to the ground swell, and, if not rescued promptly, could reasonably be expected to "pound her bottom out." The bottom was of two-inch, soft wood planking.

The forefoot of the Pioneer was crushed, the keel was damaged along almost its entire length, and the strainers on the sea suction lines, six feet above the keel, were broken. The cost of repairs was $16,432.20. Prior to stranding, the value of the Pioneer was $114,000 and the value of her net was $15,000. The value of the North Queen, including her net, was $135,000. An award of $12,000 was allowed for the salvage service rendered by the North Queen.

---

[1] The testimony was conflicting as to the distance the water line of the Pioneer was above the water at the bow. The estimates ranged from 1 foot to 5 feet. While the Trial Court made no finding on the point, he expressed the view, in orally announcing his decision, that 1 foot was too low and 5 feet, too high, and that the correct distance was somewhere in between.

The only question presented is whether the award is too high. The appellants contend that it is grossly excessive and that there was error in the standards applied in fixing it in that the Trial Court failed to take into consideration the availability of other assistance, the possibility that the Pioneer might have freed herself in the rising tide, and the lack of danger to the North Queen, and that the Court over-emphasized the skill employed by the salvors.

The Trial Court found that the Pioneer was stranded on submerged rocks, could not free herself, required immediate assistance, was in great peril of the sea and elements, and in distress and "danger in extremis" and that she was rescued by the exercise of great skill and ingenuity on the part of the Master and crew of the North Queen. The Court further found that the services of the salvors showed "real seamanship in an emergency and exceptional skill based on experience of a high type;" were "of a very high order of merit," and were the "prime and major factor" in extricating the Pioneer from the rocks.

■ The testimony of the two owners and the engineer of the Sunlight was by deposition. All other testimony, including that of the Masters and crew members of the Pioneer and the North Queen and the expert witnesses, was given orally, in open court. There is no lack of competent evidence to support the Trial Court's findings. Considering all of the evidence, and giving the findings that considerable measure of weight to which we think they are entitled, since they are based, in large part, upon the testimony of witnesses heard by the Court, it is our conclusion that the findings should stand.[2]

■ A Trial Court has wide discretion in determining the amount of a salvage award, since it embraces not only appropriate compensation for the services rendered, but also a reward in the nature of a bounty to encourage voluntary exertions for the saving of imperiled ships and their cargoes.[3] The amount of the bounty depends upon many factors, well-known, but not subject to precise admeasurement.[4] In view of all the circumstances of the present case and the Trial Court's findings that the Pioneer, when on the rocks in extreme and imminent peril, was extricated with comparatively minor damage by the exceptionally prompt, skillful, and ingenious efforts of her salvors, we are unable to say that the award, although a liberal one, was grossly or palpably excessive, even though some of the factors ordinarily considered in salvage cases were absent or were present only in slight degree.

■ It is true, as appellants point out, that there is no mention in the findings of the arrival of the Sunlight upon the scene early in the salvage operations, but we think the Trial Court was justified in disregarding the possible availability of effective assistance from that quarter. A cable from the Pioneer had been taken by the North Queen before the Sunlight arrived. It proved inadequate to sustain a conventional, straight pull. The Sunlight had no heavier cable aboard. It was important that the Pioneer be extricated promptly and that objective was accomplished by the exercise of exceptional skill, based on experience of a high type, of the

[2] The Ernest H. Meyer, 9 Cir., 84 F.2d 496; Matson Nav. Co. v. Pope & Talbot, 9 Cir., 149 F.2d 295; United States v. Lubinski, 9 Cir., 153 F.2d 1013; Tawada v. United States, 9 Cir., 162 F.2d 615.

[3] The Blaireau, Md., 2 Cranch 240, 6 U.S. 240, 264, 2 L.Ed. 266; The Sandringham, D.C.Va., 10 F. 556, 570; The Tordenskjold, 5 Cir., 255 F. 672; The Kekoskee, D.C.Wash., 47 F.2d 235, 238.

[4] The circumstances to be considered as the "main ingredients" in fixing the amount of a salvage award, as stated in The Blackwall, 10 Wall. 1, 77 U.S. 1, 14, 19 L.Ed. 870, and quoted approvingly in The Wahkeena, 9 Cir., 56 F.2d 836, 838, and in numerous other cases, are as follows: "(1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

Master and crew of the North Queen. There is no evidence that the Master and crew of the Sunlight possessed the requisite skill to render such effective and timely aid.

█ Appellants also point out that San Pedro is only thirty miles from Laguna Beach, and assert that judicial notice should be taken of the availability of numerous tugs in such an important harbor. If it be assumed, however, that tugs and salvage equipment were to be had there, although so far as the record shows, none was ever summoned to aid the Pioneer, there is no evidence as to what time they would have required to reach the stranded vessel. Several hours would appear to be a fair estimate, and, taking the facts as found by the Trial Court, the Pioneer was in no position to wait that long.

As to the question of danger, or lack of danger, to the North Queen, the finding that the Pioneer was stranded on a submerged rock table, surrounded by kelp, would justify the conclusion that the North Queen, unequipped for salvage and entering the area on a dark night for emergency rescue purposes, was in some danger. That the Trial Court thought so is evidenced by the statement in his oral opinion that " * * * there was a good deal of danger [to the North Queen] to be apprehended in going close to the obstacles in the pathway which caused the Pioneer to become fixed on the rocks."

In support of their contention that the award is manifestly excessive, appellants, in their brief, cite numerous salvage cases. On the other hand, appellee cites cases in support of the reasonableness of the award. We do not consider it advisable to discuss them in detail. Obviously, the amount of a salvage award must depend upon the circumstances of the particular case. As the Court aptly remarked in The Craster Hall, 5 Cir., 213 F. 436, 437: " * * * where the amount of award is the only vital question, very little assistance is obtained by study and analysis of the facts in other salvage cases." The cases cited by appellants, in which it is claimed the allowances are proportionately lower than the award here, differ substantially in their basic circumstances from the present case. In many of them, the rescued vessel was not stranded, but was disabled and adrift,[5] or on fire at a dock, or in a harbor.[6] In some, the salvage services were characterized by the Court as of a low order of merit,[7] while in others, the rescue was by a commercial tug, equipped for salvage and not, as in the instant case, by a vessel not so equipped, which voluntarily and against self-interest deviated from its voyage to assist another ship in distress.[8] In two of the cited cases, the amount of the award was reduced because the salvors showed bad faith in libeling the rescued vessel for an exorbitant amount.[9] In each of the stranding cases cited, a vessel had gone aground on a muddy or sandy shore or bar,[10] or had stranded

---

[5] Rodriguez v. Bagalini, 9 Cir., 17 F.2d 921; The West Harshaw, 2 Cir., 69 F.2d 521; The Melody, 9 Cir., 157 F.2d 448.

[6] The Bay of Naples, 2 Cir., 48 F. 737; The John J. Howlett, D.C.Penn., 256 F. 971, 972; The Kekoskee, D.C.Wash., 47 F.2d 235; Petition of Atlantic Gulf & West Indies S.S. Lines, 2 Cir., 49 F.2d 263; Richfield Oil Co. v. Curry, 9 Cir., 55 F.2d 875.

[7] The High Cliff, 2 Cir., 271 F. 202; The Hesper, D.C.Tex., 18 F. 692, Id., 122 U.S. 256, 7 S.Ct. 1177, 30 L.Ed. 1175; The Monticello, D.C.Cal., 81 F. 211; Ulster S.S. Co. v. Cape Fear Towing & Transportation Co., 5 Cir., 94 F. 214; The Lucia, D.C.Florida, 222 F. 1015; Rodriguez v. Bagalini, cited in footnote 5.

[8] The Egbert H., 5 Cir., 131 F.2d 111; The Craster Hall, 5 Cir., 213 F. 436;

The Professor Koch, D.C.Mass., 260 F. 969; The Bretanier, 4 Cir., 267 F. 178; City of Portland, 5 Cir., 298 F. 27; The Santa Rosa, 4 Cir., 5 F.2d 478; The Wahkeena, 9 Cir., 56 F.2d 836.

[9] Rodriguez v. Bagalini, cited in footnote 5; The Kekoskee, D.C.Wash., cited in footnote 6.

[10] The Hesper, cited in footnote 7; The Niagara, D.C.N.Y., 89 F. 1000; Ulster S.S. Co. v. Cape Fear Towing & Transportation Co., cited in footnote 7; Simpson v. Dollar, 9 Cir., 109 F. 814; The Lucia, cited in footnote 7; The St. Charles, D.C.Va., 254 F. 509; The Tordenskjold, cited in footnote 3; The Bretanier, cited in footnote 8; The Santa Rosa, cited in footnote 8; De Aldamiz v. Th. Skogland & Sons, 5 Cir., 17 F.2d 873; Huasteca Petroleum Co. v. United States, 2 Cir., 27 F.2d 734.

on rocks[11] in such a manner that it was not in immediate and urgent peril and it was not necessary for the salvors to work in haste and in darkness in the vicinity of kelp-covered, submerged rocks.[12] In the particular circumstances of the present case, we do not regard the award of $12,-000 as grossly excessive and it will not be reduced.

Decree affirmed.

---

[11] The Locke Garve, 9 Cir., 182 F. 519; The Kia Ora, 4 Cir., 252 F. 507; The Professor Koch, cited in footnote 8; Societa Commerciale Italiana De Navigazione v. Maru Nav. Co., 4 Cir., 280 F. 334; Huasteca Petroleum Co. v. 27,907 Bags of Coffee, 2 Cir., 60 F.2d 907.

[12] See cases cited in footnotes 10 and 11.